O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.B., a minor, by and through his Guardians ad litem, DILIP B. and ANITA B.; DILIP B. on his own behalf and ANITA B. on her own behalf,<br><br>      Plaintiffs,<br><br>      v.<br><br>POMONA UNIFIED SCHOOL DISTRICT,<br><br>      Defendant. | CASE NO. CV 06-4874 AHM (RCx)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW REJECTING ADMINISTRATIVE LAW JUDGE'S DECISION |

1

**TABLE OF CONTENTS**

2 INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3      I.     Factual Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4      II.    Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5      III.   The Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

6      IV.   Plaintiffs' Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7      V.     Defendant's Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8      VI.   Hearing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

9

10 APPLICABLE LEGAL PRINCIPLES  . . . . . . . . . . . . . . . . . . . . . .  11

11      I.     FAPE and IEP General Requirements  . . . . . . . . . . . . . . . . . . 11

12      II.    Designated Instructional Services . . . . . . . . . . . . . . . . . . . . . . 13

13      III.   IDEA Procedures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

14      IV.   Judicial Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

15

16 THIS COURT'S RULINGS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

17      I.     Procedural Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18      II.    Student's Loss of an Educational Opportunity . . . . . . . . . . . . 22

19      III.   Reimbursement and Compensatory Educational Services . . . 24

20

21 CONCLUSION . .  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

22

23

24

25

26

27

28

1

2                                    **INTRODUCTION**

3    **I.     Factual Background.**[1]

4           This matter concerns the right of Plaintiff S.B. ("Student") to a free

5    appropriate public education ("FAPE") under the Individuals with Disabilities in

6    Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*[2]  Student is a five and one half

7    year-old child who is "eligible for special education services under the

8    classification 'language and speech disorder with autistic like behaviors.'"

9    (Pleadings, Ex. 18. at p.0229.)  In the fall of 2004, he was placed as a "pre-

10   kindergartner" in Kingsley Elementary School ("Kingsley") within Defendant

11   Pomona Unified School District ("District").  (*Id.*)

12          In September 2004, at the age of four, Student was first diagnosed with

13   "mild autism" by his private physician.  (*Id.*)  At the time, Student was attending a

14   private preschool.  (*Id.*)  His preschool teacher for the prior year was Rabia

15   Khatoon.  (*Id.*)  Shortly after his diagnosis, Student's parents approached the

16   District to have Student's educational needs assessed.  (*Id.*)  On October 28, 2004,

17   the District performed a "Transdisciplinary Preschool Team Assessment."  (*Id.*)

18   The District's assessment team included three District psychologists, a special day

19   class teacher and a nurse.  (*Id.*)  The team assessed Student in areas of suspected

20   disability, observed Student in his preschool setting and spoke with his preschool

21

22          [1]  The following facts have been derived from the administrative record and
23   the Administrative Law Judge's ("ALJ") Decision ("the Decision").  They are set
     forth more fully in pages three through fourteen of the Decision.  In this Order,
24   references to Student's age, development and educational placement are as of the
25   time the administrative record was developed.

26
            [2]  In 2005, the Individuals with Disabilities in Education Improvement Act
27   ("IDEIA") became effective.  It re-authorized and updated the IDEA.  In this
28   Order, however, the citations will be to the IDEA.

                                             3

teacher, Ms. Khatoon, about her observations of Student.  (*Id.*)  The team also administered standardized developmental questionnaires to Student's parents and preschool teacher.  (*Id.*)  The assessment found that Student was eligible for "special education and related services in the areas of language/speech disorder and autistic like behaviors, leaving the final determination for eligibility and placement to the Individual Education Plan (IEP) team."  (*Id.* at p.0229-0230.)

On November 18, 2004, the District convened an initial IEP team meeting to discuss its assessment of Student's needs, determine Student's eligibility for special education and develop an appropriate educational program for him.  (*Id.* at p.0230.)  Both of Student's parents, a District administrator, a language and speech specialist, a special education teacher, a school psychologist and a nurse attended the IEP team meeting.  (*Id.*)  Ms. Khatoon, Student's preschool teacher, did not attend the meeting, and there is no evidence that either the District or Student's parents invited her to attend.  (*Id.*)  Student's parents did not object to her absence. (*Id.*)

At the meeting, the IEP team determined that Student was eligible for special education and addressed Student's deficiencies.  (*Id.*)  The IEP team developed annual goals and short-term benchmarks designed to address Student's needs.  (*Id.*)  The District offered Student the following educational program: placement in a Special Day Class ("SDC") four days per week for three and one-half hours per day; speech and language services twice per week for thirty minutes per session; physical education as part of the SDC; and an extended school year. (*Id.* at p.0231.)  Student's IEP did not include a plan for behavioral support or occupational therapy ("OT").  (*Id.*)  Student's parents signed the IEP on November 18, 2004, indicating their consent to implement the program as offered by the District.  (*Id.*)

Shortly after this meeting, Student began attending an SDC at Kingsley. (*Id.*)  The SDC had fourteen pupils and was taught by Sonia Alexander, a co-

teacher and three instructional aides.  (*Id.*)  Within the first few days of attendance in class, "Student displayed difficulty in completing transitions and activities independently."  (*Id.*)  He tried to run out of the classroom if staff was not in close proximity, needed personal assistance to complete many tasks and often engaged in "self-stimulatory behaviors."  (*Id.*)  In December 2004, Ms. Alexander recognized that Student would require additional attention and teaching, "as his skills and behavior seemed to be less developed than the assessments had indicated."  (*Id.*)

On March 22, 2005, another IEP team meeting was held with Student's parents, Ms. Alexander, and the District's program administrator for special education.  (*Id.* at p.0233).  An addendum to the November 2004 IEP was developed "which added a Behavior Teaching/Intervention Plan ("BTIP") designed to address Student's needs for support in following the classroom routine and transitioning."  (*Id.*)  The District also offered a behavioral assessment and an OT assessment.  (*Id.*)  A private provider conducted the OT assessment on March 28, 2005 and the District performed a "Functional Behavior/Discrete Trial Assessment" in April and May 2005.  (*Id.* at p.0234.)

On May 31, 2005, the District convened another IEP meeting to review the OT and behavioral assessments.  (*Id.* at p.0235)  Student's parents, a school psychologist, classroom teacher Ms. Alexander, another special education teacher, an occupational therapist, and the special education program administrator attended the meeting.  (*Id.*)  Ms. Alexander indicated that Student had not completed the goals set forth in the previous IEP meeting, although he made some progress.  (*Id.*)  At the meeting, the District offered a new IEP that included an SDC that met five days a week and included additional OT, language and speech, and social skills sessions.  (*Id.* at p.0235-36.)  Student's parents agreed to the District's recommendations for the Fall placement.  (*Id.* at p.0236.)

On July 2, 2005, Student's mother sent a letter to the District stating that she thought the District had failed to assess Student properly and that she had arranged

for a private psychological assessment by Dr. Robin Morris for which she would be seeking reimbursement. (*Id.*)  The assessment by Dr. Morris recommended one-on-one discrete trial training ("DTT"), both in home and in Student's current school placement, totaling 40 hours per week. (*Id.*)  On August 19, 2005, Student's mother sent the District a letter stating that due to the District's failure to offer Student a FAPE, she had arranged for a program for Student at home, for which she would seek reimbursement from the District. (*Id.* at p.0237.)  Shortly thereafter, a private behavior therapy company, Autism Behavior Consultants ("ABC"), assessed Student and recommended 40 hours per week of in-home behavior therapy, 12 additional hours per month of supervision and four hours per month of consultation. (*Id.*)

   On October 10, 2005, Student's mother removed Student from school.  On October 12, 2005, Student's mother informed the District that Student would participate in a home program in the mornings and attend the SDC class in the afternoons. (*Id.* at p.0238.)   He did not return to school until November 28, 2005. (*Id.* at p.0238, 0240.)

   On November 3, 2005, the District convened an IEP team meeting and offered Student a new IEP that increased Student's time in the classroom and the frequency of additional language, psychological, and OT services. (*Id.* at p.0238-39.)  Student's mother agreed with the IEP modification, but did not agree with Student's full day placement in an SDC. (*Id.* at p.0239.)  Student's mother declined to sign the IEP at the November 3, 2005 meeting. (*Id.*  at p.0240.)  Between November 28, 2005 and March 10, 2006, Student attended school in the afternoons as requested by his mother. (*Id.*)  On March 15, 2006, the District sent Plaintiffs written notice of a modified IEP for the 2005-2006 school year, in which 20 of the 30 offered hours in school per week would be spent in one-on-one DTT, outside of the classroom during the regular school day. (*Id.*)  Student's parents did not accept this placement. (*Id.*)

## II.      Procedural Background.

On January 3, 2006, Plaintiffs filed a request for a due process hearing with California's Office of Administrative Hearings, Special Education Division ("OAH") contending that the District failed to provide Student with a FAPE for the 2004-2005 and 2005-2006 school years.  In addition, Plaintiffs sought reimbursement for the cost of the independent educational evaluation performed by Dr. Morris.  A three-day due process hearing was conducted from March 27, 2006 to March 29, 2006.  The hearing was held before ALJ Martha J. Rosett.

Plaintiffs were represented by their attorney, Bruce Bothwell.  The District was represented by its attorney, Robert Roice.

Three issues were considered at the hearing:

1.      For the period from Student's initial IEP meeting on November 18, 2004 to the end of the 2005 extended school year, did the District offer Student a FAPE in the least restrictive environment?

2.      For the period from the beginning of the 2005-2006 school year to his next anticipated annual IEP meeting, did the District offer Student a FAPE in the least restrictive environment?

3.      Should the District be ordered to reimburse Student's parents for the independent educational evaluation obtained from Dr. Robin Morris?

The ALJ received oral and documentary evidence.  All witnesses were cross-examined.  The ALJ issued a Decision on May 5, 2006, finding that the District prevailed on all issues.

On August 9, 2006, Plaintiffs[3] filed a complaint with this Court, alleging a cause of action for reversal of the OAH ruling and naming the District as a defendant.[4] The complaint was filed pursuant to 20 U.S.C. § 1415(i)(2)(A), which allows any party aggrieved by the findings and decision rendered in the due process hearing to bring a civil action in state or federal district court. Plaintiffs filed an Amended Complaint on October 18, 2006 and a Second Amended Complaint on January 19, 2007. Plaintiffs appeal the ALJ's finding that (1) the District provided Student with a FAPE during the 2004-2005 extended school year, (2) the District offered to provide Student with a FAPE for the 2005-2006 school year, and (3) Parents are not entitled to reimbursement for the costs of an independent evaluation by Dr. Morris and for in home behavior therapy provided by ABC. This Court has jurisdiction under the IDEA, 20 U.S.C. § 1400 *et seq.*, to hear appeals from special education due process hearings.

**III.   The Decision.**

In this case, ALJ Martha J. Rosett issued a lengthy, detailed decision. She concluded that:

> Failure to include Student's preschool teacher in the November 2004 IEP team meeting was a procedural violation of Title 20, United States Code, section 1414(d)(1)(B). However, failure to include Student's preschool teacher in the IEP team meeting in November 2004 did not prevent parents from meaningfully participating in the IEP process, nor did it result in a loss of educational opportunity for Student. The

---

[3] Student is bringing this action through his guardians ad litem, Anita B. and Dilip B, who are also plaintiffs on their own behalf. Accordingly, "Plaintiffs" refers collectively to Student and his parents.

[4] The California Department of Education ("CDE") was also initially named as a defendant. On January 4, 2007, this Court granted CDE's motion to dismiss the Amended Complaint, with leave to amend.

parents were present at that meeting, and did not object to the
preschool teacher's absence.  In addition, the Transdisciplinary
Assessment Team observed Student in his preschool, and interviewed
his preschool teacher.  They obtained the teacher's input in the form of
answers to standardized questionnaires from which data was provided
for their assessment.  The parents were not hindered in their
participation in the IEP process due to the teacher's absence from the
IEP meeting.  Petitioners failed to establish that the teacher's absence
from the November 2004 IEP meeting resulted in a loss of educational
opportunity.

(Pleadings, Ex. 18. at p.0245.)

The ALJ supported her findings with testimony and documentary evidence
presented by the parties during the hearing.  The Decision was impartial and the
ALJ's reasoning was sensitive to the complexities of the case.  Thus, the Decision is
entitled to substantial weight.  However, this Court disagrees with a key conclusion
of law of the Decision-- that the District's failure to include Student's regular
education teacher in the November 2004 IEP team was a procedural violation of the
IDEA that did not result in a loss of educational opportunity for Student.

**IV.   Plaintiffs' Arguments.**

Plaintiffs object to the significance the ALJ attached to the failure of
Student's parents to object to the preschool teacher's absence.  Plaintiffs assert that
20 U.S.C. § 1414(d)(1)(B)(ii) and Cal. Educ. Code § 56341(b)(2) "placed upon
Defendant the affirmative obligation to attempt to secure Ms. Khatoon's attendance
at the November 18, 2004 IEP meeting," and that "[t]here is no requirement that the
parents state an objection at the time of the IEP meeting."

Plaintiffs also contend that any input that Ms. Khatoon provided prior to the
IEP meeting "does not excuse the Defendant's failure to invite her to the actual IEP
meeting, which according to law, is the time and place at which a disabled child's

1  individualized educational program will be discussed and developed."  Had she

2  attended the IEP meeting, Ms. Khatoon "could have elaborated on [Student's]

3  classroom performance" because the teacher "had a year of experience with

4  [Student] in her classroom."

5       Plaintiffs further argue that the ALJ ignored Ninth Circuit precedent in which

6  the Ninth Circuit held that a school district's failure to include a regular education

7  teacher in a student's IEP team is a procedural violation of the IDEA, resulting in a

8  lost educational opportunity for the student.

9  **V.**    **Defendant's Arguments.**

10       Defendant contends that "Plaintiff's claim that the November 18, 2004 IEP is

11  a fatal procedural violation denying [Student] a FAPE fails on three grounds: (1)

12  case law does not require the child's *present* teacher to attend the IEP (2) preschool

13  has never been considered a 'regular education environment' for purposes of

14  assembling an IEP team and (3) the failure to include her at the IEP meeting itself

15  was not a material failure to provide a FAPE.

16       First, Defendant cites *R.B., ex rel. F.B. v. Napa Valley Unified School Dist.*,

17  496 F.3d 932 (9th Cir. 2007) for the proposition that there is no requirement that a

18  child's *current* regular education teacher attend the IEP meeting.  Defendant implies

19  that the attendance of a special education teacher at the IEP meeting is sufficient to

20  satisfy 20 U.S.C. § 1414(d)(1)(B)(ii)-(iii).

21       Second, Defendant argues that "there is no authority that the requirement of

22  having a 'regular education teacher' when a child is participating in a 'regular

23  education environment' has ever been applied to a *preschool* setting for a 4 year-old

24  child."  Defendant notes that Plaintiff has not cited any cases that held that a

25  preschool is a "regular school environment."  Without citing any legal authority

26  itself, Defendant asserts that because no evidence indicates that Student received

27  any "instruction" or "anything other than daycare" at the preschool, the IDEA did

28  not require that Khatoon attend the November 18, 2004 IEP meeting.

1    Third, Defendant argues that Khatoon's absence at the IEP meeting was not a
2  "material failure" sufficient to "automatically violate the IDEA."  Khatoon's
3  "observations were incorporated" into the IEP meeting because the report of the
4  transdisciplinary team "reflects the observations and input of Ms. Khatoon at that
5  time."  Defendant contends that "the parents did not object to the non-attendance of
6  Ms. Khatoon, undoubtedly because of their understanding of her input into the IEP
7  process."

8  **VI.    Hearing.**

9    On April 14, 2008, this Court held a hearing on Plaintiffs' appeal of  the
10  OAH Decision.  At the hearing, Defendant did not challenge this Court's then
11  tentative conclusion that Student did not receive a FAPE for the 2004-2005 school
12  year due to the District's failure to include Student's regular education teacher in
13  the November 2004 IEP team.  Instead, Defendant contended that subsequent to the
14  November 2004 IEP team meeting the District held another IEP team meeting on
15  May 31, 2005 that reviewed independent occupational therapy and "Functional
16  Behavior/Discrete Trial" assessments that the District had conducted in March and
17  May 2005, respectively.  Defendant argued that it provided Student with a FAPE
18  for the 2005-2006 school year because at the May 2005 IEP meeting the District
19  offered Plaintiffs a new IEP that was based on those independent OT and behavioral
20  assessments and that included a Special Day Class that met five days a week and
21  provided additional OT, language and speech sessions.  Thus, Defendant claimed
22  that its failure to include Student's regular education teacher at the November 2004
23  IEP meeting neither tainted the formation of subsequent IEPs nor deprived Student
24  of a FAPE for the 2005-2006 school year.

25    In addition, Defendant also challenged the Court's finding that Student's
26  parents were entitled to reimbursement for the cost of the independent educational
27  evaluation performed by Dr. Morris.  Defendant claimed that there was no evidence
28  in the administrative record establishing that Student's parents actually incurred any

1  costs for that evaluation.  However, Defendant conceded that it would not challenge

2  the Court's finding on this ground if Plaintiffs provided such evidence.

3  **APPLICABLE LEGAL PRINCIPLES**

4  **I.    FAPE and IEP General Requirements.**

5          A FAPE requires special education services to be provided at public expense

6  including an appropriate education that conforms with the IEP.  *See* 20 U.S.C §

7  1401(9).  Special education is "specially designed instruction, at no cost to parents,

8  to meet the unique needs of a child with a disability."  20 U.S.C. § 1401(29).

9          The State must identify, locate, and evaluate all children with disabilities in

10  the State.  *See* 20 U.S.C. § 1412(a)(3); *see also* Cal. Educ. Code § 56301.  An initial

11  assessment must be performed to determine whether the child is disabled.  *See* 20

12  U.S.C. § 1414(a)(1).  A child with a disability includes those with a variety of

13  impairments, including speech or language impairments, visual impairments,

14  serious emotional disturbances, orthopedic impairments, autism, and other health

15  impairments, or specific learning disabilities.  *See* 20 U.S.C. § 1401(3)(A).  A child

16  aged 3 through 9 with a disability may include a child experiencing developmental

17  delays in physical, cognitive, communication, social, emotional, or adaptive

18  development.  *See* 20 U.S.C. § 1401(3)(B).  It is undisputed that Student suffers

19  from a multitude of the above-noted impairments and developmental delays.

20          The child must be assessed in "all areas of suspected disability."  20 U.S.C. §

21  1414(b)(3)(B); *see also* 34 C.F.R. § 300.304(c)(4); Cal. Educ. Code § 56320(f).

22  The assessment must be conducted in a nondiscriminatory manner, validated for the

23  specific purpose for which it is used, and administered by "trained personnel in

24  conformance with the instructions provided by the producer of the tests."  Cal.

25  Educ. Code § 56320(a),(b); *see also* 34 C.F.R. § 300.532(a),(c).  The evaluation

26  must include a "variety of assessment tools and strategies to gather relevant

27  functional and developmental information, including information provided by the

28  parent, that may assist in determining whether the child is a child with a disability

12

and the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general curriculum . . . ." 20 U.S.C. § 1414(b)(2). *See also* 34 C.F.R. § 300.532(b).

Based on the assessment, a team of qualified professionals and the parent determine if the child is disabled. *See* 20 U.S.C. § 1414(b)(4). The IEP team[5] includes the parents of the disabled child, at least one of the child's regular education teachers, at least one special education teacher, a representative of the local educational agency, and, whenever appropriate, the disabled child. *See* 20 U.S.C. § 1414(d)(1)(B). *See also* Cal. Educ. Code § 56341. The team must include at least one teacher or specialist with knowledge in the suspected area of disability. *See Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996). An IEP must be developed, reviewed and revised for each disabled child. *See* 20 U.S.C. § 1412(a)(4). The IEP must be implemented as soon as possible after its completion. *See* 5 C.C.R. § 3040.

---

[5] Under 20 U.S.C.§ 1414(d)(1)(B), an "IEP Team" means "a group of individuals composed of– (i) the parents of a child with a disability; *(ii) not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment)*; (iii) not less than 1 special education teacher, or where appropriate, not less than 1 special education provider of such child; (iv) a representative of the local educational agency who– (I) is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities; (II) is knowledgeable about the general education curriculum; and (III) is knowledgeable about the availability of resources of the local educational agency; (v) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi); (vi) at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and (vii) whenever appropriate, the child with a disability." (Emphasis added.)

A FAPE is provided if the program (1) meets the student's unique needs, (2) provides educational benefit by providing adequate support services for the child to take advantage of educational opportunities, and (3) comports with the IEP. *See Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 893 (9th Cir. 1995) (citing *Board of Education v. Rowley*, 458 U.S. 176, 188-89 (1982)).  The State is not required to furnish "every special service necessary to maximize each handicapped child's potential." *Rowley*, 458 U.S. at 199.  "An 'appropriate' education does not mean the absolutely best or 'potential-maximizing' education for the individual child." *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987*)*.

A court may order reimbursement for a private placement if the court determines that the private placement was proper and that the public placement was inappropriate. *See School Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359, 370 (1985); *see also Gregory K.*, 811 at 1315.  Parents who "unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local officials, do so at their own financial risk.  If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents would be barred from obtaining any reimbursement for any interim period." *Burlington*, 471 U.S. at 373-74.

## II.   Designated Instructional Services.

"The 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201; *see also Gregory K.*, 811 F.2d at 1314.  The program must take into consideration a child's unique educational needs,  including academic, social, health, emotional, communicative, physical, and vocational needs. *See Seattle Sch. Dist., No. 1*, 82 F.3d at 1500.

The individualized requirements of a FAPE include the provision of "special education and related services." 20 U.S.C. § 1401(9). Services qualify as "related services" if they are supportive services required for a disabled child to benefit from special education. *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883 (1984). Related services, also referred to as "designated instruction and services" or "DIS," Cal. Educ. Code § 56363, are defined as "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children," 20 U.S.C. § 1401(26)(A); *see also* 2 C.C.R. § 60010(h). Language and speech development and remediation, adaptive physical education, and physical and occupational therapy are included in the list of related services available to the student. *See* Cal. Educ. Code § 56363(b)(1), (5), (6). Occupational therapy is provided to address: "(A) Improving, developing or restoring functions impaired or lost through illness, injury, or deprivation; (B) Improving ability to perform tasks for independent functioning if functions are impaired or lost; and (C) Preventing, through early intervention, initial or further impairment or loss of function." 34 C.F.R. § 300.34(c)(6)(ii).

"To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5); *see also Rowley*, 458 U.S. at 202.

## III.   IDEA Procedures.

Parents may file a complaint regarding whether their child is receiving a FAPE and have the opportunity for an impartial due process hearing to be conducted by the State educational agency. *See* 20 U.S.C. § 1415(f). "The School

1 District has the burden of proving compliance with IDEA at the administrative
2 hearing, including the appropriateness of its evaluation and its proposed
3 placement." *Seattle Sch. Dist., No. 1*, 82 F.3d at 1498.

4       Any party aggrieved by the findings and decision rendered in the due process
5 hearing has the right to bring a civil action in State court or federal district court.
6 *See* 20 U.S.C. § 1415(i)(2)(A). The court, "in its discretion, may award reasonable
7 attorneys' fees as part of the costs to the parents of a child with a disability who is
8 the prevailing party." 20 U.S.C. § 1415(i)(3)(B).

9 **IV.**   **Judicial Review.**

10       The burden of proof lies with the party challenging the due process hearing
11 decision. *See Seattle Sch. Dist.*, 82 F.3d at 1498 (citing *Clyde K. v. Puyallup Sch.*
12 *Dist.*, 35 F.3d 1396, 1399 (9th Cir. 1994)). In this case, Plaintiffs have the burden
13 of proof and they have carried that burden by showing that the District's failure to
14 include Student's regular education teacher in the November 2004 IEP team was a
15 procedural violation of the IDEA that resulted in a loss of educational opportunity
16 and a denial of a FAPE for Student.

17       Compliance with IDEA is reviewed de novo. *See Ojai Unified Sch. Dist. v.*
18 *Jackson*, 4 F.3d 1467, 1473 (9th Cir. 1993) (citing *Gregory K.*, 811 F.2d at 1314);
19 *see also Seattle Sch. Dist. No. 1*, 82 F.3d at 1499. "Complete de novo review,
20 however, is inappropriate." *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*,
21 267 F.3d 877, 887 (9th Cir. 2001). Courts should not "substitute their own notions
22 of sound educational policy for those of the school authorities which they review."
23 *Rowley*, 458 U.S. at 206; *see also Gregory K.*, 811 F.2d at 1311. Courts must
24 "give[] 'due weight' to the decisions of the states' administrative bodies" and "defer
25 to their 'specialized knowledge and experience.'" *Amanda J.,* 267 F.3d at 888
26 (quoting *Rowley*, 458 U.S. at 206-08). The extent of deference to be given to the
27 hearing officer's decision is within the discretion of the reviewing court. *See*
28 *Gregory K.*, 811 F.2d at 1310. Where the hearing officer issues a decision that is

1   "careful, impartial . . . and . . . sensitiv[e] to the complexities of the issues

2   presented," that decision is entitled to substantial weight.  *Ojai*, 4 F.3d at 1476; *see*

3   *also Glendale Unified Sch. Dist. v. Almasi*, 122 F. Supp. 2d 1093, 1099-1100 (C.D.

4   Cal. 2000).  Here, the Court finds that the ALJ's Decision is sufficiently careful,

5   impartial and sensitive to the issues presented to be entitled to substantial weight.

6        "The traditional test of findings being binding on the court if supported by

7   substantial evidence, or even a preponderance of the evidence, does not apply.  This

8   does not mean, however, that the findings can be ignored.  The court, in recognition

9   of the expertise of the administrative agency, must consider the findings carefully

10  and endeavor to respond to the hearing officer's resolution of each material issue.

11  After such consideration, the court is free to accept or reject the findings in part or

12  in whole."  *Gregory K.* 811 F.2d at 1311 (quoting *Town of Burlington v. Dept. of*

13  *Educ.*, 736 F.2d 773, 792 (1st Cir. 1984)).  Although the ALJ's Decision here is

14  careful, impartial, and sensitive to the complexities of the issues presented, for the

15  reasons set forth more fully below the Court rejects its findings because the Court

16  disagrees with a key conclusion of law of the Decision-- that the District's failure to

17  include Student's regular education teacher in the November 2004 IEP team was a

18  procedural violation of the IDEA that did not result in a loss of educational

19  opportunity for Student.

20        Compliance with IDEA is determined by both a procedural and substantive

21  evaluation.  *See Seattle Sch. Dist., No. 1*, 82 F.3d at 1498; *see also Capistrano*, 59

22  F.3d at 891.  First, the court must determine whether the State complied with the

23  procedures of the Act, including the creation of an IEP.  *See Rowley*, 458 U.S. at

24  207 n.27.  "'[P]rocedural inadequacies that result in the loss of educational

25  opportunity,' or seriously infringe the parents' opportunity to participate in the IEP

26  formulation process, or that 'caused a deprivation of educational benefits,' clearly

27  result in the denial of a FAPE. . . .  An IEP which addresses the unique needs of the

28  child cannot be developed if those people who are most familiar with the child's

1  needs are not involved or fully informed." *Amanda J.*, 267 F.3d at 892 (internal
2  citations omitted).  If the procedural flaws do not result in a loss of educational
3  opportunity, then a FAPE was not denied.  *See Burke County Board of Education v.*
4  *Denton*, 895 F.2d 973, 982 (4th Cir. 1990).

5       Second, the Court must determine, from a substantive standpoint, whether the
6  program is "reasonably calculated to enable the child to receive educational
7  benefits." *Rowley*, 458 U.S. at 207.  The court must focus "primarily on the
8  District's proposed placement, not on the alternative that the family preferred."
9  *Gregory K.*, 811 F.2d at 1314.  Even if the parents' preference is better for the child,
10  the District's placement is still appropriate if it was reasonably calculated to provide
11  educational benefit to the child.  *See id.*  The adequacy of the District's placement is
12  not judged in hindsight; rather, it is judged at the time the IEP was drafted.  *See*
13  *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).

14                   **THIS COURT'S RULINGS**

15  **I.**     **Procedural Violation.**

16       The absence of a regular education teacher at the IEP meeting is a procedural
17  violation.  Contrary to Defendant's assertion, the ALJ herself reached that
18  conclusion:  "Failure to include Student's preschool teacher in the November 2004
19  IEP team meeting was a procedural violation of . . . section 1414(d)(1)(B)."
20  (Pleadings, Ex. 18. at p.0244.)

21       The Ninth Circuit has held that the "plain meaning of the terms used in
22  section 1414(d)(1)(B) compels the conclusion that the requirement that at least one
23  regular education teacher be included on an IEP team, if the student may be
24  participating in a regular classroom, is mandatory- not discretionary." *M.L. v.*
25  *Federal Way School Dist.*, 394 F.3d 634, 643 (9th Cir. 2005).  In that case, an IEP
26  team, which included the disabled plaintiff's preschool teacher, proposed an IEP for
27  the child.  It provided for his enrollment in an "integrated" class that included
28  children who were not disabled.  Before the plaintiff enrolled in an integrated

kindergarten class, however, he and his family moved to the defendant school district.  (*Id.* at 638.)  The defendant district implemented the IEP prepared by the plaintiff's previous school district.  It enrolled the plaintiff in an integrated class until the IEP expired.  (*Id.*)  After the IEP expired, the defendant district assembled an IEP team and held an IEP meeting in which a special education teacher, but no regular education teacher, participated.  (*Id.* at 639-40.)  A member of the IEP team interviewed the child's preschool teacher from the previous district and the IEP team considered a letter written by that teacher.  (*Id.*)  In her letter, the teacher stated that the child had made progress and recommended that he remain in an "integrated," general education classroom.  (*Id.*)  However, the IEP team concluded that the child would benefit from a small setting and recommended that he attend a classroom that consisted only of disabled students.  (*Id.*)  The child's parents rejected the IEP team's recommendations.  (*Id.*)  At a due process hearing, the ALJ found that the district's "evaluation team was appropriately constituted."  (*Id.* at 641.)  The district court affirmed and granted a motion for summary judgment in favor of the school district.  (*Id.*)

        The Ninth Circuit reversed.  It held "that the district court's finding that the IEP team was properly constituted under the IDEA without at least one regular education teacher was clearly erroneous."  (*Id.* at 643.)  Judge Alarcon's opinion emphasized the importance the Supreme Court has attached to the IDEA's procedural safeguards, citing *Rowley* at footnote 9:

> "[T]he importance Congress attached to [the Act's] procedural safeguards cannot be gainsaid . . . .  We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP . . . demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."  *Rowley,* 458 U.S. at 205-06.

19

1   *Id.* at 650.

2          What Judge Gould noted in his concurring opinion about the importance of

3   compliance with this procedural requirement is important here:

4          The statutory requirement that an IEP team for a disabled child who is

5          or may be in regular education must include a regular education

6          teacher is not merely technical.  A regular education teacher may have

7          insights or perspectives that aid in the process of IEP formation.

8   *Id.* at 656.[6]

9          There is no support for Defendant's argument that the absence of Ms.

10  Khatoon was no violation because Student's preschool was not a "regular school

11  environment."  Although the IDEA does not define a "regular education teacher" or

12  "regular education environment," the statute's definitions of a "child with a

13  disability" and a "FAPE" suggest that Congress intended the benefits of the IDEA

14  and its corresponding procedural safeguards to apply to children attending

15  preschool.  For example, the IDEA defines a "child with a disability" as a child

16  "aged 3 through 9."  20 U.S.C. § 1401(3)(B).  The IDEA defines a "free appropriate

17  public education" as "special education and related services that . . . (C) include an

18  appropriate preschool, elementary school, or secondary school education in the

19  State involved."  20 U.S.C. § 1401(9)(C).  In *M.L.*, the Ninth Circuit noted that

20         "[I]n *Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist.*, 317

21         F.3d 1072 (9th Cir. 2003), we held that the failure to include a

22         representative from the private school that the child was currently

23         attending on the IEP team violated the procedural requirements of the

24         IDEA.  We reasoned that the failure to include 'the teachers most

25  _____

26         [6] In *R.B. v. Napa Valley United School District,* 496 F.3d 932, 940 (9th Cir.

27  2007), the Ninth Circuit noted that "We have held, more often than not, that an
    IDEA procedural violation denied the child a FAPE."  496 F.3d at 940.

28

knowledgeable about [the child's] special educational levels and
needs' was a violation of the IDEA.  *Id.* at 1076-77.[7]
394 F.3d at 645.

Nor has Defendant established a proper basis to rely on *R.B. v. Napa Valley*
*Unified School District*, 496 F.3d 932 (9th Cir. 2007).  True, the Ninth Circuit held
in that case that the IDEA does not require the attendance of the child's *current*
regular education teacher.  Nevertheless, 20 U.S.C. § 1414(d)(1)(B)(ii) still requires
that if the child is or may be in a regular education environment, at least one regular
education teacher attend the IEP meeting.[8]  *Napa Valley* does not support
Defendant's contention that the attendance of a special education teacher at the IEP
meeting held here is sufficient to satisfy section 1414(d)(1)(B)(ii) given that
Student had spent one year in the regular education environment.

Defendant's argument that its failure to include Khatoon is "not a material
failure to provide a FAPE" also is without merit.  Defendant cites *Van Duyn ex rel.*
*Van Duyn v. Baker School Dist. 5J*, 502 F.3d 811, 821 (9th Cir. 2007)[9] for the
proposition that "minor failures in implementing an IEP, just like minor failures in

---

[7] In *Shapiro,* the student's precise age at the time she attended the private
school is not disclosed explicitly, but the opinion characterized her as a seven year
old who had attended the private school for three full years preceding her
enrollment in the public school.  It thus appears that she was a four year old at the
beginning of her saga - - a pre-schooler.  *See* 317 F.3d at 1074.

[8] The 1997 amendments to the IDEA superseded the prior construction of
this statute that a child's *current* regular education teacher was a mandated member
of the IEP team.  *See R.B. v. Napa Valley Unified School District*, 496 F.3d 932,
939 (9th Cir. 2007).

[9] This Court cites to the applicable portions of the amended opinion in *Van*
*Duyn*.  (The parties cited to the initial opinion, at 481 F.3d 770.)

following the IDEA's procedural requirements, should not automatically be treated as violations of the statute."  The amended opinion relaxed the standard for determining when a failure to implement an IEP is material.  The standard now is that a failure is material "when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP."  502 F.3d at 815, 826.  In the previous opinion, the Court stated that for a failure to be material "the services a school provides to a disabled child [had to] fall significantly short of what was required by the IEP . . . ."  481 F.3d at 784.

The Ninth Circuit in *Van Duyn* did not address a school district's failure to comply with the IDEA's requirement that "at least one regular education teacher of [a] child" attend an IEP meeting.  However, in *M.L. v. Federal Way School Dist.*, *supra,* the Ninth Circuit did address this issue and held that a school district's failure to ensure the participation of a child's regular education teacher constituted a procedural violation of the IDEA.  394 F.3d at 643 ("[A] district court's finding that the IEP team was properly constituted under the IDEA without at least one regular education teacher was clearly erroneous.")

## II.    Student's Loss of an Educational Opportunity.

"A child is denied a FAPE only when the procedural violation result[s] in the loss of educational opportunity or seriously infringe[s] the parents' opportunity to participate in the IEP formation process."  *R.B., ex rel. F.B. v. Napa Valley Unified School Dist.*, *supra*, 496 F.3d at 938 (internal citations and quotations omitted).

Student was in Khatoon's classroom for one year and by virtue of that responsibility Khatoon was an individual falling within the class of those whom Congress concluded are "most knowledgeable about a disabled student's special educational needs."  *See, M.L. v. Federal Way School Dist.,* 394 F.3d at 646 ("The IEP team did not include individuals Congress concluded were most knowledgeable

about a disabled student's special educational needs. As a result, we have no way of determining whether the IEP team would have developed a different program after considering the views of a regular education teacher."). As stated in *M.L. v. Federal Way School Dist.*, the failure to include Student's regular education teacher on the IEP team deprived the team of "important expertise regarding the general curriculum and the general educational environment." *Id.* at 646. *See also W.G. v. Board of Trustees of Target School Dist. No. 2, Missoula, Mont.*, 960 F.2d 1479, 1485 (9th Cir. 1992) (affirming trial court's finding that school district deprived student of FAPE by developing an IEP without the input and participation of student's parents and regular education teacher).

The majority opinion in *M.L.* rested in part upon the finding that the IEP team provided the student with an IEP that had few opportunities for "mainstreaming," i.e., interaction with non-disabled students. (*Id.* at 640.) In his concurring opinion, Judge Gould noted that "[a] regular education teacher may have insights or perspectives that aid the process of IEP formation" and he emphasized the statutory preference for mainstreaming and concluded that the District's procedural violation resulted in a lost educational opportunity, because a properly constituted IEP team would likely have given greater consideration to mainstreaming and would have provided the student an IEP with more mainstreaming opportunities. (*Id.* at 656-57.)

Defendant argues that "[t]here is no evidence that with [Ms. Khatoon's] physical attendance at the meeting that the plan developed would have been any different." The Court is unable to determine whether Khatoon would have persuaded the other team members to formulate a different IEP had she attended the November 2004 IEP meeting. But she would have had the opportunity to do so.

The District also contends that Khatoon's "observations were incorporated" in the IEP meeting because the report of the transdisciplinary team "reflects the observations and input of Ms. Khatoon at that time. The transdisciplinary team

1   obtained Khatoon's input through an interview and through her answers to
2   standardized questionnaires.  However, Khatoon's comments in an interview or
3   responses to standardized questionnaires could not fully account for Khatoon's
4   experiences with or observations of Student over the prior year.  Had Khatoon been
5   a member of the IEP team and attended the IEP meeting in which Student's IEP was
6   prepared, she could have shared her observations of Student's abilities and special
7   needs from the year that Student was in her classroom.  At the very least she could
8   have elaborated on what she had told the transdisciplinary assessment team:   that
9   Student "seems out of touch with reality," "prefers to play by himself and avoids
10  other children," "babbles to self," "is able to gesture and physically prompt [the
11  teacher]," and repeatedly attempts "to run out of the classroom."  (Student's
12  Documentary Evidence, Ex. 18 at p.0126.)

13          Moreover,  the preponderance of the evidence shows that the initial IEP that
14  the District prepared for Student at the November 2004 IEP meeting did not
15  effectively address Student's needs.  Within the first few days that Student attended
16  the SDC required by the initial IEP, Student's SDC teacher, Ms. Alexander, noticed
17  that Student "displayed difficulty in completing transitions and activities
18  independently," tried to run out of the classroom if staff was not in close proximity,
19  needed personal assistance to complete many tasks, and often engaged in "self-
20  stimulatory behaviors."  (Pleadings, Ex. 18. at p.0231.)  The following month, Ms.
21  Alexander recognized that Student would require additional attention and teaching
22  because, as the ALJ found, Student's "skills and behavior seemed to be less
23  developed than the assessments had indicated."  (*Id.*)  The District took several
24  steps to address Student's needs, including conducting behavioral and OT
25  assessments.  The District convened two additional IEP meetings, on March 22,
26  2005 and May 31, 2005, at which the initial IEP was modified and then replaced by
27  a new program.  This suggests that the initial IEP insufficiently addressed Student's
28  special needs from the start.  Further, Student's special education teacher, Ms.

Lynch, "attended the annual IEP meeting on November 3, 2005, and she testified that [Student] had not met any of his annual goals from his initial IEP of November 18, 2004 . . . [and] that annual goals are developed with the intention that in a year's time they will have been met, and that annual goals are the measurement by which a determination is made whether a disabled child has benefitted from an educational program." (Lynch Witness Summary at 2:6-14.)

Given the apparent shortcomings of the initial IEP that the District prepared for Student, a preponderance of the evidence shows that Khatoon's participation at the November 2004 IEP meeting, as mandated by the IDEA, would have assisted the IEP team in devising a program that was better tailored to Student's abilities and special needs.  Accordingly, the District's procedural violation of the IDEA resulted in Student's loss of an educational opportunity and his denial of a FAPE.

The District contended at the hearing that its procedural violation of the IDEA deprived Student of a FAPE only for the 2004-2005 school year because the District held an IEP meeting on May 31, 2005 that reviewed independent occupational therapy and "Functional Behavior/Discrete Trial" assessments that the District had conducted in March and May 2005, respectively.  However, the record indicates that the May 2005 IEP meeting developed an IEP that evolved from and did not cure the deficiencies of the initial, improperly-developed IEP.  First, the record shows that the "reason" for the May 31, 2005 IEP meeting was to review the 2005 OT and behavioral assessments.  (Student's Documentary Evidence, Ex. 8 at p.0033.)  That meeting resulted not in a new plan but in an "Addendum" to the November 2004 IEP.  (*Id.*)  Next, although the Addendum did recommend that the District provide additional OT and social skill services, Student's parents also "asked about discrete trial intervention @ home," which the District rejected because it did "not feel [Student] needs home program to continue making progress towards goals."  (*Id.* at p.0043.)  Most of those "goals' had already been set forth in the November 2004 IEP.  Relying on those "goals," the District declined to offer

1  Student discrete trial training.   On March 15, 2006, the District reversed course and
2  offered Student "one-on-one discrete training for 20 hours per week, outside of the
3  classroom, provided during the regular school day."  (Pleadings, Ex. 18. at p.0240.)
4  Finally, the record indicates that one year after the November 2004 IEP meeting,
5  despite the March and May 2005 assessments and the May 2005 IEP team meeting,
6  Student "had not met any of his annual goals from his initial IEP of November 18,
7  2004."  (Lynch Witness Summary at 2:6-14.)
8       Thus, the Court finds that the IEP that the District developed at the May 2005
9  IEP meeting evolved at least in part from the improperly-developed November
10 2004 IEP and as a result suffered from its deficiencies.  Accordingly, the District's
11 procedural violation of the IDEA resulted in Student's loss of an educational
12 opportunity and his denial of a FAPE for both school years.
13 **III.    Reimbursement and Compensatory Educational Services.**
14      Plaintiffs contend that they are entitled to reimbursement for the cost of the
15 independent evaluation performed by Dr. Robin Morris.  On July 8, 2005, Student's
16 mother sent the District a letter stating: "Please be advised due to failure of district
17 to properly assess [Student] we have arranged for a private psychological
18 assessment for [him], and will be seeking reimbursement from school district."
19 (Student's Documentary Evidence, Ex. 40.)   Plaintiffs also seek reimbursement for
20 the cost of Student's therapy program and all related supervision provided by ABC
21 through the date of the annual IEP meeting on December 7, 2006.  Finally,
22 Defendants seek compensatory educational services in the form of additional
23 private OT and speech therapy to be provided by ABC.  "A parent has the right to
24 an independent educational evaluation at public expense if the parent disagrees with
25 an evaluation obtained by the public agency . . . ."  34 C.F.R. § 300.502.  *See also*
26 Cal. Ed. Code § 56329(b).
27      The ALJ concluded that Student's parents are not entitled to reimbursement
28 for the evaluation by Dr. Morris because the parents "initially did not express

1   disagreement with any of the District's assessments performed between October
2   2004 and June 2005" and because Plaintiffs "failed to establish that the District's
3   assessments were inappropriate." (Pleadings, Ex. 18. at p.0229.)  The Court
4   disagrees.  Because the IEP team that initially assessed Student was improperly
5   constituted and later assessments evolved from this initial assessment, Student's
6   parents were entitled to an independent educational evaluation at public expense.
7   Thus, the District shall reimburse Student's parents for the independent evaluation
8   performed by Dr. Morris.

9        As to ABC, the ALJ ruled that Student's parents were not entitled to
10  reimbursement for the costs of behavior therapy provided in the home by ABC
11  because "it was not established that for either of the school years at issue, the
12  District failed to provide Student with a FAPE." (*Id.* at p.0246.)  The converse is
13  also true; this Court now having found that the District's procedural violation of the
14  IDEA denied Student a FAPE, the District cannot fairly dispute that the private
15  services provided by ABC were proper.  Therefore, Student's parents are entitled to
16  reimbursement.

17       Under the IDEA, federal courts reviewing state administrative proceedings
18  are to "grant such relief as the court determines is appropriate" based on a
19  preponderance of the evidence. *Amanda J.*, 267 F.3d at 887 (citing U.S.C. §
20  1415(i)(2)(B)).  "[E]quitable considerations are relevant in fashioning relief," and
21  the court enjoys "broad discretion" in fashioning such relief. *School Committee of*
22  *Burlington*, 471 U.S. at 374.

23       Plaintiffs seek reimbursement for the cost of Student's therapy program and
24  all related supervision provided by ABC through December 7, 2006, the date of the
25  annual IEP meeting.  However, Plaintiffs' contention that "[i]t should also be
26  determined that during the time periods at issue [Student] required 35-40 hours per
27  week of individual ABA therapy" (citing the recommendations of Dr. Morris and
28  the program provider ABC) lacks adequate factual support.  Further, according to

27

1   the invoices for the ABC therapy that Plaintiffs submitted, on average ABC has
2   been providing Student only 15 hours per week of direct therapy and 8 hours per
3   month of supervision.[10]  (Student's Documentary Evidence, Ex. 42.)    According to
4   the February 28, 2006 Progress Report prepared by ABC, Student "has shown
5   improvement in all goal areas over this reporting period.  Over the past three
6   months, his problem areas have reduced . . . ."  (*Id.*, Ex. 16 at p.0109.)  Thus, given
7   Student's improvement in all goal areas while receiving 15 hours of direct therapy
8   per week and 8 hours per month of supervision, it is that level of service that is
9   appropriate for reimbursement.  The District shall reimburse Student's parents for
10  the costs of Student's private therapy program provided by ABC through December
11  7, 2006, not to exceed 15 hours of direct therapy per week and 8 hours of
12  supervision per month.  Plaintiffs shall promptly provide to Defendant evidence of
13  Plaintiffs' expenditures for the independent evaluation by Dr. Morris and for the in
14  home behavior therapy provided by ABC.

15       Plaintiffs are not entitled to compensatory educational services,
16  notwithstanding *Burr v. Ambach*, 863 F.2d 1071 (2d Cir. 1988), which they cite.  In
17  *Burr*, the Second Circuit upheld a Hearing Officer's decision to award
18  compensatory education to make up for the time a student was wrongfully denied
19  placement in a special education program.  (*Id.* at 1078.)  Here, although the District
20  failed to comply with the procedural requirements of the IDEA, it did not
21  wrongfully deny Student placement in special education.  In fact, on March 15,
22  2006, the District sent Plaintiffs a letter offering Student "one-on-one discrete
23  training for 20 hours per week, outside of the classroom, provided during the

24
25
26
27
28

---

[10]  The monthly invoices are from October 2005 until March 2006 and reflect
charges approximately between $3,500 and $4,000 per month.  (Student's
Documentary Evidence, Ex. 42.)

regular school day," a program that appears similar to what ABC provides Student at home.

## CONCLUSION

The District denied Student a FAPE by failing to include Student's regular education teacher in the November 2004 IEP team.  That procedural violation resulted in a loss of educational opportunity for Student.  Accordingly, the District shall reimburse Student's parents for (1) the costs of the independent evaluation performed by Dr. Morris, and (2) the costs of Student's private therapy program provided by ABC through December 7, 2006, not to exceed 15 hours of direct therapy per week and 8 hours of supervision per month.

By no later than April 28, 2008, Plaintiffs shall submit a judgment consistent with this Order.  The judgment shall incorporate the amount of their expenditures for the independent evaluation by Dr. Morris and for the in home behavior therapy provided by ABC.

IT IS SO ORDERED.

DATED:  April 15, 2008

_____
A. Howard Matz
United States District Judge